BENTLEY, J.
In the case of the The Lake Shore & Michigan Southern Railroad Company v. Starkey, the railroad company seeks a reversal, of the judgment rendered by the court of common pleas in favor of Mr. Starkey, against the defendant in error, for the sum of-810,000 for injuries received by Mr. Starkey while in the employ of the company on the 18th of April, 1891, at Kipton, Ohio. It is charged, .and appears from the evidence, that on the day named, train No'. 14 of the Lake Shore & Michigan Southern Railway, bound eastward — a mail and passenger train — and the fast passenger train No. 21, bound westward, met in a terrific collision at Kipton, and quite a large number of people were thereby killed. The plaintiff below, the defendant in error here, was fireman on the engine attached to train No. 14. When he saw that the collision was imminent, he got down upon the st9ps of the engine, and jumped off. He says that the momentum was so great that he rolled along upon the ground and ties for some ninety feet, and received severe and permanent injuries. He charges in his petition that this collision and his injury occurred by reason of the negligence of the railroad company in various particulars. One of the charges of negligence was,that there was a water tank near the track at Kipton which prevented the company’s agent from seeing the approach of the train in a certain direction, which otherwise he might have seen, and if he had seen it upon this occasion, he had facilities for stopping- it and preventing this collision. Another item of negligence charged is that the company had at Kipton only one person to attend to all of its business, there; that is, the telegraph business, seeing to the baggage, selling of tickets, the receiving and delivering of freight and making- of reports to the company, and all of the various matters-usually to be attended to for the company at that, a freight and passenger station, and that this force was insufficient; so that this person, who should have been at his post at the office, at the telegraphic instrument, was compelled by his duties to be elsewhere at the time this collision occurred, and that therefore he could not be reached by a warning telegram sought to be sent him from Cleveland, and was not in a position to - prevent this collision which otherwise he could have prevented. It is also charged in the petition that the meeting- time of these two trains at Kipton was too close, there being only three minutes by the-schedule between the time of the arrival of train No. 21 at that point and the passage of No. 14 having the right of way, not stopping regularly at Kipton; that the schedule provided only three minutes after the arrival of No.21 at that point for it to get in on to the side track, and with the chances of No. 21 being late, or of something occurring or liable to occur, it was taking too-great a risk to arrange a schedule with only three minutes difference at that point.
In the amended petition it is also charged that the conductor and engineer of No. 21 were negligent upon the particular day in question, because when they arrived at Oberlin, a station east of Kipton, and about five miles from it, they were late; that they should have arrived there at 4:38 in the afternoon and should’ have arrived at Kipton, according to their schedule time, at 4:49,. giving 11 minutes time; that, as a matter of fact, they arrived ac Oberlin as late-as 4:43 and remained there some three minutes, and did not depart until 4:46, or a little after, and that having-. *702 no special orders to meet No. 14 at Kipton. and having no guide except the schedule time, and knowing that No. 14 was due at Kipton at 4"52, they were negligent in starting out of Oberlin as late as they did, because they had not time, according to the ordinary way of running a train, even jf they put their train to its utmost speed, to arrive at Kipton and get out of the way of No. 14 by 4:52; that notwithstanding that they pulled out of Oberlin, and on this account, the collision occurred.
These are the various charges of negligence preferred in the petition, and (he amended petition upon which the case Anally went to trial.
The company, in the case before us on error, claim that the court of common pleas erred in various particulars, one being the allowing of testimony to be given that a certain rule — which had been rescinded — bad been once in existence. The company objec ted to that, but the court overruled the objection and allowed the plaintiff to give that rule in evidence. This was rule No. 10, which had been rescinded some iime before his accident occurred, and which provided in substance that when two passenger trains were to meet at any station, they should each come to a full stop between the switches. The idea being, perhaps, to avoid the danger of collision, for as both trains would havo to slow down when compelled to stop within the switches, the danger of collision would be less.
One of the charges in the petition, as I have said, was that there was no rule provided by the company for the stopping of trains in that way; that is, no rule at the time of tne collision, and that it was negligence upon the part of the company not to have a rule in force at that particular time, and the question presented here iu whether or not it was error for the court to admit that proof — that there had been a rule which had been rescinded. We have come to the conclusion that this was not error for two reasons. Olio was that it showed a recognition or admission upon the part of the company at one time, that such a rule was proper, and that its attention had been called to the necessity, or at last propriety of such a rule.
The other reason — and it seems to us pretty clear that it applies —is tiiis: It was incumbent upon the plaintiff, in order to sustain this branch of his petition, to prove the negative fact, to prove that there was in fact, no su'di rule applicable at that time and place, provided for by the company. Now, in order to prove the negative fact, he offered this evidence — that there was a rule upon the subject; that prior to this time, the rule had been abrogated. With that evidence in, and no further evidence upon the subject, it seems to us that ibe jury would be warranted in finding the negative fact, that is to say upon proof that a rule upon the subject liad existed and had been rescinded, with no proof or suggestion that another one had ever been substituted, or that any regulation thereafter had ever been adopted, the jury might be warranted in finding that that state of circumstances contin jod to exist, and that there was an absence of such regulation at the. time of the injury.
The counsel for the railway company also complain that the court erred in its charge in reiterating the charges of negligence in the petition before the. jury, without stating the defenses of the railroad company to these various charges; that is, that while the court may have correctly enumerated the charges of negli *703 genoe, by stating them in detail in that way, without stating the other side, it gave undue prominence to the claim of the plaintiff over the claims of the defendant.
The fact was,the court enumerated these charges and then said substantially this: “All these charges of negligence are put in issue by the denials of the defendant;” and then proceeded to state*tc the jury that they were called upon to look into all the testimony and say what the facts Were regarding these various charges.
Now, seeing that there were several charges of negligence, it might have been proper for the judge to have stated with a little more fullness, perhaps, the position of the railway company upon these various matters; but he did say that these matters were all denied; that they were put in issue, and that the plaintiff had to prove them. It is a little difficult to see at once what the court could have said, under the circumstances of the case, to give prominence to the defense of the railway company without going somewhat into detail of the proof in the case.
We think it would bo going entirely too far for this court to say that the words used gave'such undue prominence to tho plaintiff’s case so as to warrant a reversal of the judgment.
The defense of the railway company was a mere denial. Thera were no affirmative facts set up by the railway company avoiding these charges, and the whole issue was thus presented by the court in his statement to the jury.
Wo have also examined the court’s charge with reference to the rule given to the jury as to what constitutes negligence. It was stated in general terms by the counsel for the railway company that the court s charge in this respect was misleading; but in all that'the court sail to the jury in this respect, we are unable to see that the proper rule was not iaid down: in fact, we think the rule was given as liberally as the railroad company could demand. The substance of it was, without taking time now to road the charge of the court upon that subject, that the railway company was held to such a degree of cars as, under the circumstances, a prudent person wouid ordinarily exercise. The company claims, however, that the facts of the case — all the evidence being preserved and brought before us by bill of exceptions — did not warrant the verdict that was rendered; that none of these charges were so proven as to warrant a verdict. I will not go over the proof regarding these charges, except that I will allude to one of the charges simply, and that is the negligence of the conductor and engineer of train No. 21. In starting out of Oberlin at the time they did and under the circumstances they did, were they guilty of negligence? If they were. under the statute and the ruling in the Margrat case, they stood in the place of the company and the company was chargeable with their negligence.
If; is in proof that it required, in the ordinary running of passenger trains, such as No. 21, at least nine minutes between Oberlin and Kipton. and the testimony was that it required the train ta be run at great speed, more than Usual speed, to make the .distance and get it on to the side track in the nine minutes. The schedule provided by the railroad company gave eleven minutes. It is in proof that it would he utterly impossible to run there and get tlie train in on the sidetrack in less than eight minutes.
They started out. I shall assume as a fact for the moment, that it is true they started from Oberlin at 4:46. They were thus very *704 late. _ There were no special orders given to them. They were-running under such information as the schedule time gave to. them, and also to those with the other train — No. 14.
They knew by the schedule which they were provided with, that No. 14 was due at 4:52, and they started from Oberlin, as-I say,_ at 4:46, at least, as late as 4:46. Under these circumstances, we think no prudent human being could have failed to fear a collision. They simply took the chances, and a collision was certain, unless it should happen that at that particular time, No. 14 should be late. The proof is that as a general thing, No. 14 was on time at Kipton, and while occasionally it might be late, and was late, yet these parties in charge of No. 21, of course, would, have no right to presume upon this chance and thus to jeopardize lives committed to their care. If they did that, then it seems perfectly conclusive to us that they were negligent. But in this respect, it is said that there is a conflict of testimony as to whether they did start at 4:46. It is claimed by the defendant, and proof' is offered tending to show that at Oberlin the conductor of No. 21 asked his engineer whether they had time to make Kipton be-' fore No. 14 should arrive there, and the engineer responded that they had plenty of time; that thereupon the conductor, whose duty it was to give the signal to start the train, gave the signal to start, and the train proceeded towards Kipton.
Now, it is said that the watches of the engineer and conductor upon No. 21 were not correct at the time; that their watches-showed more time than they actually had. The engineer upon No. 21 was killed by this collision, and sometime after the accident in cleaning up the debris, his watch was found, and while the back of it was somewhat mutilated and jammed, the face was intact' and perhaps the crystal was broken (it was a hunter case). It showed that the hands of his watch had stopped at about 4:41 and some seconds, and the argument is that if the collision stopped’ his watch, it was too slow, or if his watch had stopped before, he was in either case alike, misled. The conductor is called as a-witness in the case, and he himself testifies that instead of starting out from Oberlin at 4:42, he started at 4:43, and that his watch so indicated. All the proof in the case abundantly shows-that the way the train was run. it could not hava been that he started as early as 4:43, the collision occurring at about 4:54 at Kipton, and against all the circumstances in the case,and against the record of the company kept by its officers, who attended to that duty, the conductor testifies that, in fact (not that his watch simly showed that), but that, in fact, he started at 4:43.
Now, we think in that particular he was mistaken; that the-train did not start at 4:48, and not before 4:46, whatever his watch may have shown. He says that he corrected his watch at Cleveland. There is no testimony as to his comparing it at any other-place or at any other time.
But something is argued from the position of the hands of the-watch of the dead engineer, that he, at least, made a mistake. Now, there is a mystery connected with that. The testimony-shows that these hands could not have been moved readily — the watch being stopped — except by the application of a certain instrument designed for that purpose without breaking the hands,, and that these'hands showed it stopped at 4:41; that the watch-must haV9 stopped while in possession of the engineer at 4:41.
This might afford ground for speculation as to when it occurred) *705 ■■and what its hands indicated and all that, were there no other testimony than that I have spoken of; but there is another piece of testimony that was given to the jury — whether properly or not, we need not decide — because it went to the jury, and it is in the record without objection, and that is this: The fireman says that the engineer,' when he arrived near Efipton, toon out his watch, and looked at it and said, “We have got just two minutes to make the switch.” If that is true, his watch must have indicated at that time, or at least he must have thought it indicated, that it was 4:50.
E. D. Potter, Jr., for Plaintiff in Error.
Scribner & Hurd, for Defendant in Error.
Now, if bis watch showed 4:41 and had stopped at that point, it could not have been that when he arrived a Kipton, or when it stopped, did show the time to be 4:50, that is two minutes before •the schedule time of No. 14 to arrive, and so doubt is thrown upon the question.
Without speaking of the testimony in relation to the other charges of negligence, it seems to us that these officers of train No. 21 were negligent, and their negligence being imputable to the company, the verdict of the jury might well have been founded wholly upon that circumstance. Of course, under the rule, if any one of these charges of negligence was sufficiently proven, it warranted the verdict; that is, it warranted some verdict in favor of the plaintiff below. It is, however, urged by the counsel for the plaintiff in error, that this verdict was too large — ten thous- and dollars. It is a large verdict, and possibly may be larger than many juries would have given; perhaps larger than the court, under the proof, if the facts had been submitted to it, would have given; but it appears in proof, and there is no doubt thrown upon that by any of the evidence, that the plaintiff below was terribly injured. He must have been from such a fall — jumping from the train under circumstances of that kind. He was violently projected some ninety feet along the ground and the ties of the track. He could not possibly have escaped without serious injury, it seems to us, and the proof is that his leg was splintered and fractured; that the fracture probably splintered up into the knee joints. The proof is that he had an injury to the upper part of his ■leg, and a great abscess had formed there, and that his leg above the knee,- at the time of the trial, was shrunken; the muscles, as the doctors testify, were shrunken and permanently impaired, and his shoulder and other parts of his body received permanent injuries. There was also a wound upon his ear, head and scalp, but how deep or whether permanent or not, perhaps the proof does not show; but the proof indicates, without anything to discredit the idea, that the plaintiff is substanially crippled for life, so that he will be unable to do manual labor to any extent. His leg is drawn up, and crooked, and weak and considerably shorter than the other; and while it may be that a careful estimate by a very cautious jury, might have brought this verdict down below ten thousand dollars, we think it would be going too far for this court to say that the amount of it, under the facts proven, indicates that the jury were moved by either passion or prejudice, or by any other improper motive. With these views of the case, we -are constrained to affirm the judgment,and that will be the order.